Judgment rendered July 16, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,385-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

JEFFREY SHANNON GLOVER                    Plaintiff-Appellant

versus

SECURE LINK TECHNOLOGIES,                 Defendant-Appellee
LLC

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2020-1006

Honorable Jefferson Bryan Joyce, Judge

* * * * *

BREITHAUPT, DUBOS & WOLLESON,             Counsel for Appellee
LLC
By: Patrick Scott Wolleson

HUDSON, POTTS & BERNSTEIN, LLP            Counsel for Appellant
By: Brian Paul Bowes

* * * * *

Before COX, ROBINSON, and HUNTER, JJ.

**ROBINSON, J.**

Jeffrey Glover appeals a summary judgment dismissing his lawsuit in which he sought damages for what he alleged was the breach of his employment agreement by his employer, Secure Link Technologies, LLC. Concluding that genuine issues of material fact remain concerning whether Glover was an at-will employee and whether Secure Link's manager had the authority to terminate Glover, we reverse the judgment and remand.

## FACTS

Wendi and Darryl Garnett formed Video Link Technologies, LLC, in 2001 to provide video surveillance systems at daycare centers. Video Link installed the systems under the name of ChildView. In October of 2018, Secure Link was formed after Bryn Meredith and Brandon Mulhern sought to acquire an ownership interest in the business of ChildView. For a total of $300,000, Mulhern acquired a 25% interest, and Meredith obtained a 10% interest. Darryl and Wendi each kept a 30% interest. A 5% interest was given to Kenneth Johnson, a long-time employee. Secure Link's operating agreement stated that Darryl was the manager and was to receive a $60,000 salary. It also stated that Wendi was to be paid a $28,000 salary for handling accounting, administrative, and treasurer duties, and that Johnson was to be paid a $54,000 salary for technical support duties.

Glover was a former vice president of government relations and policy at CenturyLink, where his annual salary and bonus pay exceeded $450,000. In 2018, Glover lost his job with CenturyLink during a force reduction, but he was provided with a severance package which ended

in August of 2019. There were 75 employees in his department at CenturyLink, and he reported to the senior vice president of government relations. Meredith and Mulhern approached Glover about working for Secure Link.

On February 8, 2019, Glover emailed an "Employment Agreement Term Sheet" to Mulhern. It stated that "Jeff Glover will be hired to help lead the dramatic expansion of the company over the next three to five years with the goal of maximizing the firm's value for a potential sale." Glover agreed not to draw his base salary of $150,000 until July 1, 2019, in order to help increase the firm's revenue stream.

On February 15, 2019, Glover emailed Mulhern a revised term sheet that incorporated changes concerning annual bonuses and a "golden parachute" that Glover would receive in the event that Secure Link was sold.

Glover was interviewed by all the members except for Johnson on February 19, 2019. Notes from the meeting reflect that the members discussed with Glover his employment terms from the "Employment Agreement Term Sheet," which was copied in the notes. The notes stated that everyone "agreed to terms." Glover was to begin working immediately, but he did not expect to be paid until possibly the end of July.

Glover assumed the title of Chief Executive Officer ("CEO") and began working for Secure Link. When it came time for Glover to begin receiving a salary, Mulhern agreed to pay his salary for two months.

On September 25, 2019, Glover emailed Secure Link's banker, Taylor Cagle, about increasing Secure Link's line of credit to fund operations. He also inquired about accepting credit card payments. The members were

copied on the email. The next morning, Wendi replied to Glover that increasing the line of credit would be a decision made by the members, and they would not be increasing the line of credit at that time.

Four hours later, Glover replied to Wendi in a very blunt email that was copied to Darryl, Meredith, and Mulhern. He accused Wendi of overselling Secure Link's growth capabilities and underselling the amount of competition to Meredith and Mulhern. He claimed that he lost approximately $106,700 working for Secure Link while receiving "random ass chewings" from her. He accused the Garnetts of being the only people making money from Secure Link. He also accused Wendi of being "long on talk" and "short on action" in terms of helping him, and that she dragged her feet on scheduling installations. He told Wendi that she needed to focus on what she was good at, which was being a "sales wizard." Accordingly, he promoted her to vice president of sales and outlined the responsibilities of her new position, which included sending weekly progress reports to Meredith and Mulhern.

That afternoon, Glover emailed a written employment agreement to Darryl, Wendi, Meredith, and Mulhern, and asked them to sign it. He stated that he had been operating under a verbal agreement to employment terms pursuant to the term sheet. The contract stated it was made for an "initial term of ___ year(s), from August 1, 2019 through July 31, 20__."

On October 3, 2019, Darryl emailed Glover that he was terminated. The next day, Glover replied with an email that was also sent to his attorney, Wendi, Meredith, and Mulhern. Glover requested the minutes and the

resolution from the members' meeting to terminate him, which had not occurred.

On March 26, 2020, Glover filed suit against Secure Link. He alleged that the parties anticipated that the initial agreement would be for one year with continued employment thereafter and that the parties were to reduce the agreement to writing. He further alleged that his termination was improper because the provisions of the operating agreement were not followed. He contended that he was entitled to penalties and attorney fees for unpaid compensation.

On September 1, 2020, Meredith and Mulhern filed suit against the Garnetts alleging unfair trade practices and fraud.

On September 21, 2020, Glover filed a supplemental and amending petition. Darryl and Wendi were named as additional defendants. Glover alleged that the Garnetts' actions in converting the capital contributions to their own use as well as agreeing to hire Glover without paying him were a scheme to defraud Meredith and Mulhearn of their capital contributions and to defraud Glover of his promised salary and funds that he had advanced to Secure Link. He also alleged that the Garnetts' actions constituted unfair trade practices and entitled him to treble damages and attorney fees.

Secure Link filed an answer and a reconventional demand against Glover. It asserted that as a mandatary, Glover was liable to it for all losses that it sustained because of the breach of his duty as a mandatary.

On May 10, 2024, Secure Link filed a motion for summary judgment. It argued that there was no genuine issue of material fact that Glover was an at-will employee because there was no written employment agreement, the

4

term sheet did not include a fixed term of employment, and the proposed employment contract did not contain a fixed term. Secure Link also argued that Glover had no legal basis or factual support for either his unfair trade practice ("LUTPA") claim or his fraud claim.

Glover's deposition and an affidavit from Darryl were attached to Secure Link's motion for summary judgment. Darryl testified in his affidavit that Glover's "Employment Agreement Term Sheet" did not state that he expected to be promised any fixed term of employment. Darryl was reluctant to hire Glover after the February 19 interview, but at a subsequent meeting, Meredith and Mulhern convinced him to hire Glover after stating they would pay Glover's salary if he failed to meet expectations by July. Darryl consented to Glover being hired under the terms that he proposed in his term sheet. Glover eventually agreed to work without a salary through August because he was still being paid by CenturyLink under the severance agreement. Darryl claimed that he was not satisfied with Glover's job performance shortly after he was hired and considered terminating Glover, but agreed to evaluate Glover again at the end of July as requested by Mulhern. At the end of July, Darryl's opinion of Glover remained unchanged and he had become concerned that Glover was burdening Secure Link with excessive expenses, but he agreed to allow Glover to continue in his role when Mulhern said he would pay Glover's salary.

Darryl testified that at the time that Glover was hired, he was not told that Glover worked with or planned to work with Meredith and Mulhern in any business ventures outside of Secure Link. He considered Glover's email to Wendi to be insulting, insubordinate, and wholly inappropriate. He

thought that Glover's email was coordinated with hostile text messages sent by Mulhern threatening to file suit. He later discovered documents in Glover's office which showed that Glover, Meredith, and Mulhern owned a real estate development company formed on June 21, 2019. Darryl also discovered that Glover had been using Secure Link's facilities to work on other outside business ventures with Meredith and Mulhern. Darryl stated that based on the conflicts of interest, Glover's excessive spending of company funds, and the demand to increase the line of credit, he became concerned that Glover was trying to burden Secure Link with debt so that Glover, Meredith, and Mulhern could obtain leverage to acquire a controlling interest. He thought that Glover's relationship with Secure Link had deteriorated to the point that his continued employment was not in Secure Link's best interest.

Glover testified in his deposition that he agreed to a lower salary at Secure Link as long as there was an upside with a potential sale and there was job security so he could stay in the market and care for his mother. He maintained that he agreed to a multi-year employment agreement. According to Glover, the members were trying to figure out how to provide him with compensation relative to his ability to finalize a sale agreement if they decided to sell Secure Link. Glover testified that following the meeting, Mulhern told him that they had agreed to his employment subject to the revised term sheet and it would get clarified into an agreement at some point in time.

Glover claimed that he had sent Wendi an email in September requesting that she call a meeting to consider increasing the line of credit to

fund operations because they had several customer installations that needed to happen. He also claimed that he would schedule meetings of the members, but that the Garnetts would fail to appear. He maintained that he sent the email to Cagle about increasing the line of credit to draw attention to the company's liquidity crisis and get the members to meet and either approve or disapprove expanding the line of credit. He knew that he did not have the authority to unilaterally increase the line of credit.

Glover testified that after receiving Wendi's email, he told Meredith and Mulhern that it was not in Secure Link's best interest to create a liquidity crisis and he recommended to them that the members meet and make a decision.

Glover refused to answer directly when asked if he would have sent an email to his superior at CenturyLink that was similar in tone to the one that he had sent to Wendi. He contended that Wendi was not doing her job, which made him very irritated and frustrated with her. Regarding the employment contract that he emailed to the members hours after his email to Wendi, Glover explained that the contract had been sent to the group several months earlier and he had been asking for the members to meet and finalize it. He contended that the formal agreement voted on at the February 19 meeting was his revised term sheet.

Glover testified that he assumed that any decision related to his employment would be made by a majority of the members. He also testified that he believed that his termination was a significant event relative to the ongoing operations of Secure Link and required a 75% vote. He also believed that the decisions not to extend the line of credit and to fire him

7

effectively crippled Secure Link. He noted that the operating agreement states that a 75% vote is required to take any action that makes it impossible to carry on the ordinary business of the company.

Glover acknowledged that he had an interest in a real estate development company, MGM Development Group, with Meredith and Mulhern while he worked for Secure Link. MGM was registered on June 21, 2019. After he was terminated, he entered into other real estate development businesses with Meredith and Mulhern.

Attached as exhibits to Glover's deposition were: (1) a February 4, 2020 demand letter from Glover's attorney for payment of compensation; (2) Secure Link's operating agreement; (3) the February 8, 2019 email from Glover to Mulhern with the term sheet attached; (4) the February 15, 2019 email from Glover to Mulhern with the revised term sheet attached; (5) a confidentiality agreement; (6) notes from the February 19 meeting; (7) an email chain beginning with the email to Cagle and culminating with the September 26, 2019 email from Glover to Wendi; (8) the September 26, 2019 email from Glover to Meredith, Mulhern, and the Garnetts with the employment contract as an attachment; and (9) Glover's reply email to Darryl on October 4, 2019, concerning Darryl's email terminating Glover.

The operating agreement was executed on October 23, 2018. Article III of the operating agreement contains the terms for the management of Secure Link. The operating agreement names Darryl as the initial manager. Section 3.1(c) sets out the authority of the manager. It states that by a vote of members holding at least a majority interest, the members may grant to the manager any specific authority required or requested by the manager.

Except as limited by subsection (d), the manager has the authority to bind or obligate the company for any transfer or obligation.

Subsection (d) states that it requires authority of members holding at least 75% of the total interests to, among other things, take any action that would make it impossible to carry on the ordinary business of the company.

Glover argued in opposition to the motion that he had a fixed term of at least three years of employment. Glover further argued that regardless of whether he was an at-will or a fixed-term employee, Darryl lacked the authority to unilaterally terminate his employment.

Attached to the opposition were one page from a statement of contested material facts provided by Meredith, Glover's affidavit, Mulhern's affidavit, and the operating agreement.

Glover stated that it was agreed that he would be employed for a minimum of three years, but likely five years. He and the members anticipated that this agreement would later be put into a formal written contract. Glover stated that he would not have taken the Secure Link job had the members not agreed to the compensation and term of employment set forth in the term sheet. He agreed to work without salary through July because he believed his employment would be for three to five years. He met with the members for two hours on February 19, and their discussion included his term sheet. After he was asked to leave the room, the members voted to hire him as CEO pursuant to the term sheet. Before he was hired, the members expressed their intent to grow Secure Link as quickly as possible and then sell it. Over the summer, tensions grew among the members, and the minority members indicated to him that the Garnetts were

9

having second thoughts about paying his salary.   Mulhern paid his salary for September and October.  On September 25, Wendi requested that he cut expenses.  Later that day, Darryl told him that Wendi was going to delay installations in New Jersey and New Mexico because of the liquidity crisis.  Darryl asked him to resolve the liquidity crisis and to speak with Mulhern about it.  He had reduced the line of credit from $300,000 to $100,000 in March of 2019 because he knew it could be increased later with member approval.  The minority members told him that Darryl lacked authority to terminate him without a meeting and a vote.  He increased sales by 20% before he was terminated.

Mulhern stated that he and Meredith paid approximately $300,000 for a 35% interest in Secure Link.  The Garnetts were paid employees of Secure Link, but when they failed to materially increase sales, Meredith and Mulhern were compelled to find someone to focus full time on the business and increase Secure Link's value through execution of its business plan.  The goal was to increase the company's size rapidly and then have Glover use his contacts and experience to sell Secure Link for as much as possible.

Mulhern stated that at the February 19 interview, the members voted and agreed to hire Glover as CEO pursuant to the term sheet.  It was agreed that Glover's minimum employment would be for three years, but likely five years.  The agreement contemplated three to five years of employment for Glover.  It was anticipated that this agreement would be put into a formal written and signed contract.  He paid Glover's salary for September and October after the Garnetts refused to do so.

10

Mulhern asserted that Glover's termination was a breach of his contract. It was not voted on by the members, and Darryl lacked the authority to terminate Glover without a members' meeting and a vote. No member had the individual right to terminate the CEO. Mulhern believed that the decision to terminate Glover required a 75% approval pursuant to the operating agreement. In order to hire Glover, a meeting and a vote were required. It was his understanding that the same procedure should have been followed to terminate Glover.

In its reply memorandum, Secure Link argued that as members holding a 60% interest, Darryl and Wendi had the authority to direct the manager to terminate Glover. Secure Link further argued that even if there is a genuine issue of material fact regarding whether Glover was an at-will employee, he was fired for cause based on his conflict of interest from his undisclosed business relationship with Meredith and Mulhern and on his insubordinate behavior.

Granting the motion for summary judgment, the trial court concluded that there was no genuine issue of material fact as to whether Glover was an at-will employee. The court concluded there was no employment contract as it was not persuaded by the argument that there was a fixed term of three to five years.

Glover applied for a supervisory writ, which was granted by this court. This court ordered the trial court to amend the judgment to include the necessary language under La. C.C.P. art. 1918(A) and for perfection as an appeal. The trial court amended the judgment to reflect that all of Glover's claims were dismissed with prejudice.

**DISCUSSION**

Glover argues on appeal that genuine issues of material fact remain concerning whether there was an employment agreement for a fixed term and whether Darryl had the authority to terminate him.

Secure Link counters that there was no genuine issue of material fact that Glover was an at-will employee. He was familiar with the doctrine of at-will employment from his years at CenturyLink and he chose to work without an employment contract. Secure Link adds that even if Glover were not an at-will employee, there was good cause to terminate Glover because he had a conflict of interest and had become an unmanageable employee. Secure Link also argues that as manager, Darryl had full authority under the operating agreement to act on behalf of the company and fire Glover. Secure Link asserts that the self-serving and conclusory affidavits submitted by Glover are insufficient to vary the operating agreement and create a genuine issue of material fact.

The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). A motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

The burden of proof on the motion for summary judgment is found in La. C.C.P. art. 966(D)(1):

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that

is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

Regarding the submission of affidavits in support of or in opposition to a motion for summary judgment, La. C.C.P. art. 967 states in part:

A. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . .

B. When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.

A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate, *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So. 2d 880.

The doctrine of employment-at-will was discussed in depth in *Quebedeaux v. Dow Chemical Co.*, 01-2297, pp. 4-5 (La. 6/21/02), 820 So. 2d 542, 545-546:

The employer-employee relationship is a contractual relationship. As such, an employer and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy. When the employer and employee are silent on the terms of the

employment contract, the civil code provides the default rule of employment-at-will. ("[T]he doctrine of employment at-will is merely a gap-filler, a judicially created presumption utilized when parties to an employment contract are silent as to duration."). This default rule is contained in LSA–C.C. art. 2747.

Under LSA–C.C. art. 2747, generally, "an employer is at liberty to dismiss an employee at any time for any reason without incurring liability for the discharge." However, this right is tempered by numerous federal and state laws which proscribe certain reasons for dismissal of an at-will employee. For instance, an employee cannot be terminated because of his race, sex, or religious beliefs. Moreover, various state statutes prevent employers from discharging an employee for exercising certain statutory rights, such as the right to present workers' compensation claims. Aside from the federal and state statutory exceptions, there are no "[b]road policy considerations creating exceptions to employment at will and affecting relations between employer and employee."

Citations and footnotes omitted.

The basis for fixed-term employment is found in La. C.C. art. 2749, which states:

If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive, had the full term of his services arrived.

In determining the term of an employment contract where none is expressed, the understanding of the parties is to be determined from their written or oral negotiations, the usages of business and, in general, the nature of the employment and its surrounding circumstances. *Roussel v. James U. Blanchard & Co., Inc.*, 430 So. 2d 247 (La. App. 4 Cir. 1983), *citing Binnion v. M & D Drugs, Inc.*, 8 So. 2d 307 (La. App. 2 Cir. 1942).

Because employment is presumed to be "at will," an employee who alleges a fixed-term contract has the burden of proving that there was a meeting of the minds on the length of time of the employment. *Clark v.*

14

*Christus Health Northern Louisiana*, 45,663 (La. App. 2 Cir. 9/22/10), 47 So. 3d 1135.

Darryl, Glover, and Mulhern disagree over whether a fixed-term of employment was offered and accepted. Glover and Mulhern stated in their affidavits that Glover would be employed by Secure Link for a minimum of three years.

The employment contract emailed by Glover on September 26 lacked an effective date. In the section regarding the term of the contract, it merely stated that it was made for "an initial term of __ year(s), from August 1, 2019 through July 31, 20__."

In contrast, the term sheet drawn up by Glover stated that "Glover will be hired to help lead the dramatic expansion of the company over the next three to five years . . ." The notes from the February 19 meeting stated that the terms from the term sheet were discussed and that "[e]veryone agreed to terms." Glover, who was a highly-paid executive with CenturyLink, accepted employment where he would not be paid for five months.

Based on the evidence submitted in support of and in opposition to the motion for summary judgment, we conclude that a genuine issue of material fact exists concerning whether or not Glover was an at-will employee.

Secure Link argues that regardless of Glover's employment status, it had cause to terminate Glover. Even assuming this is correct, we conclude that a genuine issue of material fact exists regarding Darryl's authority to terminate Glover. Section 3.1(c) of Article III of the operating agreement states that the manager has the authority to "bind or obligate Company for any transfer or obligation, which authority includes the authority to, on

behalf of Company, buy, sell, lease, mortgage, pledge, assign or otherwise encumber movable and immovable, tangible and intangible property for or of Company." It does not refer to the manager's authority to hire and fire employees. The manager's authority is specifically limited by Section 3.1(d), which states that it takes the authority of members holding at least 75% of the total interests to, among other things, "take any action that would make it impossible to carry on the ordinary business of Company." Furthermore, Section 3.1(c) provides that by a vote of members holding at least a majority of the total interests, the members may grant to the manager "any specific authority required or requested by the [m]anager." There is no evidence that the authority to terminate Glover was granted by the members to Darryl. We further note that Glover was hired following a meeting and vote by the members. Accordingly, we conclude that a genuine issue of material fact remains regarding whether Darryl had the authority to terminate Glover.

Glover's remaining fraud and LUTPA claims are likely interwoven with the determination of his employment status. Accordingly, we pretermit any discussion of those claims.

### CONCLUSION

For the foregoing reasons, we reverse the summary judgment and remand this matter to the trial court for further proceedings. Costs of this appeal are assessed to Secure Link.

**REVERSED AND REMANDED**.

16